We'll move on to our next case. David Peary versus the city of Miami. Okay. Okay, Mr. Waxman. Are you ready? Oh, you're muted. Mr. Much better. Good morning, your honor. Benjamin Waxman, cooperating attorney for the Miami and Florida ACLU on behalf of the plaintiffs, a class of involuntary homeless people residing in the city of Miami. For 20 years, the potting juror consent decree has protected plaintiffs from Miami's government wide policy of targeting them for harassment, arrest and property destruction based on their homeless status, the gap between homeless people and shelter space remains large. The district court found that the people exceeded shelter space in Miami. The district court hearing saw some 36 homeless persons to about 42 separate incidents of property destruction, harassment and arrest in 2018 in violation of the consent decree. In unrefuted testimony that the district court credited witnesses testified they were woken by blaring buzzers and bright lights in the dead of night and were told to move out and to not return and then had their meager belongings swept to the street gathered and trucked away as garbage. Others were told without pretense of arrest to move on and leave the areas where they were. The city's systematic and widespread campaign to clear homeless people from encampments so that homeless people would not return planned at the highest city levels was identical to the campaign recounted by Judge Atkins in his seminal potting juror decision. Mr. Waxman, I thought that there was ample evidence that these encampments became very hazardous places in terms of biohazards and waste and contamination of property and that what the city was trying to do was removing these individuals from these encampments was to clean them up and to ensure that they weren't a public health hazard. Is that not right? This is part of what was going on, Judge, but the case really is not about the facts. The appeal is about the district court serious errors in misinterpreting the consent decree, a contract essentially between the city and the plaintiffs with clear and unambiguous language and misallocating the respective burdens of proof on the competing motion. So the consent decree created three primary protections for homeless people. It protected against summary seizure and destruction of property. It protected against harassment and it protected against arrest for minor offenses like being in a park after hours or trespass on public property. Regarding property, the consent decree required that the city respect personal property of all homeless people and that it preserve the property of a homeless person to the extent possible. It specifically prohibited the city from destroying, and this is a quote, destroying any personal property known to belong to a homeless person or readily recognizable as the property of a homeless person except permitted by law. And that's a very important distinction, Judge Schoflat. The consent decree allowed the city to seize property that was contaminated, but the way the district court construed it is it allowed the city to seize and destroy property that was in an area that might have been contaminated. So in a location or that was stored near or together with other things that were contaminated. So there was a very clear delineation in the consent decree that before they could seize it, this property had to be contaminated. But the district court said, well, if it's in a location where there's contamination, or if it's with other property that's contaminated, I'm going to allow it to be seized, which is contrary to the very language of the consent decree. So essentially, the court understood what the court said in terms of contamination was that it's not that it's an area that's the problem. It's the commingling of hazardous property with other property that makes all of that pose a health hazard. And that there were some items, for example, unattended bicycles that pose no health hazard that were left alone by the city workers. But for example, if you had items in a bag, at least some of which were contaminated, the city workers weren't required to search through a bag to figure out whether there was anything salvageable there or not. Is that a fair interpretation of what the district court found? That is. And our position is, again, that this runs contrary to and is a misinterpretation, a legal error in the interpretation of the consent decree that went out of its way to specifically provide enhanced protection to identification, to medication, to eyeglasses, to things that are absolutely vital to the survival of homeless persons and to ensure that those items could not be seized unless they themselves were contaminated. And so what was required was that if there was a location that was generally unsanitary, then city workers needed to go in and determine whether this property that was afforded very special protection by the consent decree, whether it in fact was contaminated. And the judge excused all of that based on, again, the property being in a location. So these were encampments where there were lots of people, there was lots of property, and the court can look, for instance, I mean, the best example is, for instance, the video evidence at docket entries 578-40A, 578-40B that showed Mr. Cawley's property that was lined up against the fence that looked to be pristine, looked to be uninfected, although the location clearly was unsanitary. And the video shows that that property was ultimately kicked to the street, gathered like garbage, and trucked away. And that was just one glaring example of the testimony of all of the homeless people that in 42 separate incidents showed that this was what was going on. So again, the focus of the argument and the error is in the district court. When did that particular incident occur? I don't have the date of that particular incident, but there is some concern about that because the incident was long before, was literally months before the health hazard that was subsequently declared in that area. But it's a very telling and graphic video example of what the city was doing. The other thing that the court did is it essentially engrafted upon the consent decree a requirement that homeless people carry their belongings around with them day to day when they were out doing their daily business, whether it be finding food, getting services, looking for jobs. So that was specifically required by the judge, though the consent decree- Mr. Waxman, I want to go back. I want to make sure I understand why you say the district court erred in its interpretation of the decree by focusing on unsanitary areas as opposed to whether an item has been contaminated by co-mingling. The district court said that when items are, quote, co-mingled with food, soiled materials, and garbage, creating a public health crisis, they're contaminated. And if a bag contains contaminated property, deciphering what is and is not contaminated inside a bag is difficult, and going through a bag that possesses contaminated materials to fish out uncontaminated materials is not a requirement of the decree. Are you saying that those statements are error? I am. We're saying that that was a misinterpretation. So I'm looking at the district court's order following the hearing, docket entry 682. I'm on page 34, and it said that the evidence showed, and this concerns Cawley's property that we just discussed, the unsanitary conditions in that location. And again, the court can see for itself from the video that the area was clearly unsanitary, but the concern, again, and the protection provided in the consent decree by clear language is that the property was protected and could not be tampered with unless the property itself was contaminated. And it's our position that just because an area is unsanitary does not excuse the city from abiding by the strict language of this contract that it entered into and governed for 20 years to determine, in fact, if these vital pieces of property, identification, medication, eyeglasses, that received special protection in this decree, the city was required to determine, even if it was difficult, even if it was not easy to examine items one by one, they were required to determine this by the very language of the consent decree that the city entered. And the judge excused the city by saying, well, the location was unsanitary or the property was together with or commingled with other property. So that's the concern. The other concern, the other concern, I'm sorry. Your time has expired. I'll give you a minute. I'll give you a minute to say what your other concern is. I'm sorry. The other concern was, again, the judge's requirement that he engrafted on this agreement for homeless people to carry their belongings because it would be too difficult. That goes against the very premise. Of course, if what the district court was saying was that that would be a good practice for an individual to undertake. I did not understand what the district court said on that point to be something that was somehow required by the decree. Am I misunderstanding that? No. What he did, again, was excuse the destruction of these vital pieces of property and placed the burden on the plaintiffs to carry their property with them, which is. All right. You've saved three minutes for rebuttal. Ms. McNulty. Good morning, Your Honors, and may it please the court. Carrie McNulty, senior appellate counsel on behalf of the city of Miami. With me today also arguing on behalf of the city of Miami is Tom Scott of Cole, Scott and Cassine. We'll be splitting our time 10 minutes to five. Okay, well, do we have. Okay, yeah, sorry. So the city takes issue with Mr. Waxman's stating that this case is not about the facts. This case is exactly about the facts. After 30, this case started 30 years ago with a class action. I think to a large degree, Mr. Waxman says that it's not about the facts because he thinks that a lot of the findings, in fact, are infected by legal error and the district court's interpretation of the decree. And if he's wrong about that, if he's wrong about those interpretations, then it seems to me that his case kind of collapses. Correct, Your Honor, and and he is wrong about those. The way they're portraying the district court's factual finding is misinterpreting the consent decree and therefore subjects don't wrote an over review. We don't get to the facts, though, until we first make sure we have a correct understanding of what the decree requires. That's, that's what I understand him to be arguing. Absolutely, Your Honor, and to determine what the decree requires, we should look at what the decree says and what it is, but specifically what it says. So with respect to the discarded personal property, which was a large focus of the evidentiary hearing and a large focus of the plaintiff's brief. They say that the district court misconstrued the consent decree by finding or requiring that or allowing the city to discard property of homeless individuals that was in a location that was unsanitary. But if you look at what the district court, the district court never said that, first of all. And the district court's findings of fact, as Your Honor pointed out, were that these areas were in such a state and the and the personal effects that may have been discarded were commingled with so much human waste, hypodermic needles, soiled bed linens, dirty mattresses that, you know, this is this particular area, the one that they're focusing on the incident involving Mr. Kali was determined a health hazard by the Florida Department of Health because it was so unsanitary and the city was ordered to bring in a biohazard team to help clean it up. Your Honor's an idea of what factually we're dealing with, but the but the district court did not air the district court found based on six days of testimony that the city did not discard any personal property that it did not determine was contaminated and the consent decree allows for discarding property that is either contaminated or poses a public health hazard. And that is what happened here. And now I do understand that it's, it's a difficult situation. Nobody wants to be going out and, you know, disrupting homeless individuals personal property, but at a certain point, we have to, we have to care for the needs of the entire community and These areas just became so these encampments became such a dire health hazard that we had to go out and sort of address them. Miss McNulty, Mr. Waxman said, if we look at the Kali video that yes, that was a contaminated area, but that Mr. McCauley had put certain items along the fence. And they were clearly segregated and they were personal items or he didn't identify what they were. And he just says, if I just look at that video, I'll see that there were non contaminated items laying up against the fence. I have not looked at the video. What is your response to that. Well, I would urge you to look at the video. It was played for Judge Moreno. It was played for everyone during the evidentiary hearing and the city workers are out there. And they're dealing with this, you can see that the it's not, it's not a broad, you know, sort of picture of the video, but you can see that there is a lot of material in the area and that the there's just, there was a dirty mattress in the video. It's, there's a lot of contaminated material that they're discarding. And the items against the fence. I'm just, I understand. I mean, yeah, if you look at the video, they, they said there was a cooler there. Honestly, it looked like an empty cat litter container. Just to give you an idea of sort of the way, you know, perception is nine tenths of reality. It's, you know, I watched the video, the district court watched the video. It didn't, it didn't appear that the city was, the city workers had pulled a bunch of stuff that looks clearly not contaminated and, and thrown it in. And if you look at it, it's just, it's just a, it looks like a big pile of belongings, you know, along the fence and, and I'm, I'm, and I'm certain they weren't all Mr.  So the district court, again, did not misconstrue that portion of the consent decree, which again allows for the disposal of contaminated property. The same would be said for the portrayal of the district court statement about keeping homeless people keeping personal small personal effects that are very cherished to them with them. Like their cell phones. A lot of them said that their cell phones were left in a bag or a suitcase and had somehow been, you know, discarded when they came back to the area. And then the court judge as just prior pointed out was just saying this would probably alleviate that problem if it's a very small item and something that can keep on them. He wasn't saying the consent decree requires it. And again, with respect to all of the things that were discarded the district court's finding was that the city did not violate the consent decree because they were discarded because they were contaminated. Um, I guess there's, there's a couple of other points that they made in terms of misinterpreting the consent decree one having to do with the harassment of homeless and the city would just point out that the consent decree. It only says what it says and it's not meant to be an end runner around a 1983 action for any alleged violation of the constitutional right of a homeless person in the city of Miami, and the, the language that they're focusing on for saying that, you know, this to prevent arrests and harassment of these persons and destruction of their property inconsistent with the provisions of this settlement agreement. It doesn't as a judge district court properly pointed out the consent decree doesn't say anything about asking a homeless person to move, whether it be for cleanup or for some other purpose. And there was no violation of the consent decree with any of those orders, the district court went further to find that there was no actual violation. But that, again, if the, if the plaintiffs want to bring some sort of claim about that that should be brought in the context of an individual 1983 action not a motion to enforce a consent decree that does not address that particular issue. With respect to the investigation, the district court judge was not finding that the did not find that the investigations were some sort of replacement for a motion to enforce or anything like that the consent decree itself actually requires that the city police department, were there to be were to be brought to their attention that any of their individual officers had potentially violated the consent decree that they open an eye investigation and potentially discipline or terminate them and that is what is going on with respect to that, that I investigation that the judge noted. And then the last point that there is a reference in the record that the police department now finally has some written guidelines. That's not correct, Your Honor, the police department always had written guidelines, it's the other city departments and it's kind of, it's a little ironic that after 30 years when 20 years ago we entered into this consent decree, the primary focus was the police department, so much so that the settlement agreement actually attached the departmental order that was to be adopted and it was approved by all the parties. And so, um, the police have always had a process and that's built into their departmental order. So the other departments had a policy, but not a written policy, which again. Yes, Your Honor. Yes, they do. It is in the record, although the judge said that because we handed in after the evidentiary hearing he did not use it as a basis for his ruling. Thank you. Thank you, Your Honor. The last point that they make with respect to the district court judge misconstruing the consent decree had to do with the prior warning requirement, and this had to do with a 2014 amendments the consent decree having to do with obstructing a sidewalk. With the 2014 amendment obstructing a sidewalk is no, if it completely blocks pedestrian traffic, or if they're blocking the right of way is no longer a considered a life sustaining misdemeanor that cannot be arrested for so long as it says you're given a prior warning. Yeah, it says one warning, right? Yes, and it doesn't say contemporaneous warning, which is important. One, because the video that they showed doesn't show what happened prior to the arrest. It was the district courts point and also I would know that In so far as there's any ambiguity about this, because this is a provision that protects the homeless class, we would construe the ambiguity against them right Um, yes, in general, I'm not sure if I mean, as a matter of Florida contract law, isn't that the way we would interpret it. Yes, but sometimes contracts have provisions saying they're not to be construed against, you know, the drafter or whatnot, but I I mean, as I understand it, the modification that was originally proposed by the city did not include this. This is something that clearly benefits the homeless class. And in the absence of any other evidence to the contrary, it would seem that the ambiguity would be construed against them. That's correct, Your Honor. And I would also just note that the arrest affidavits, which are also in the record, the officers indicated that they had given them prior warnings. So when they, I looked at the video of Archer and Bass, are those the two we're talking about? Yes, Your Honor. Archer and Bass, and they aren't given warnings right then. And I understand Judge Marino said, well, we don't know what happened before the tape started. Because the tape comes from an officer who comes up later, I think, or something like that. Is the city's position is that if you've ever given Archer and Bass a warning, they didn't have to say that day? We'll take you to the shelter. Do you want to go before they arrested them? Or is the city's position is, if they do have to say that day, we'll take you to the shelter? Well, so the 24th, sorry. It's just not captured on the video. So a couple of points. The 2014 amendment made it so that this is no longer a life-sustaining misdemeanor that would require the police. I understand you can arrest them if they've got the sidewalk. Meaning you don't have to offer shelter, because that offering shelter before the arrest is part of it being part of the life-sustaining misdemeanor. So then also, but the caveat to that change was that they have to be given a prior warning. It indicated in the arrest affidavit that they were given a warning. I don't know whether they were given a warning that day before the video started or not, and that was the district court's point. Well, there's no warning on the video, but it couldn't be the video started after the warning. I don't know. Right. But the arrest report says there had been warnings, right? Correct, Your Honor. Correct. All right. So to clarify, is the city agreeing? I know they don't have to go be taken to the shelter, but they have to be given a warning about what? A warning that they're completely blocking the right-of-way. They were on a mattress. It was completely blocking the right-of-way. They're not allowed to do that, right? Correct. The warning has to be, you're blocking the sidewalk. You're not allowed to do that. Correct, Your Honor. Yes, we can't have people blocking the sidewalk entirely. It's an ADA problem as well. I would like to pass it over to Mr. Scott, if it's okay with Your Honors, unless you have any specific questions. Mr. Waxman can be prepared to tell us what is the warning they're supposed to give. Is it that you can't block the sidewalk, or is there more they're supposed to be told before they're arrested under the 2014 amendment? Okay. Mr. Scott, you've got five minutes. Judge, Tom Scott on behalf of the city of Miami. Judges, Judge Moreno has taken care of this case for over 20 years. He accepted the case when it was settled. He understands the agreement. He was there and approved the modification in 2014, and he conducted a six-day trial in this case. He understands that agreement, and there's nothing complex about that agreement. In fact, almost every provision in that agreement deals with the police, law enforcement training, departmental orders, compliance, protocol. Only one section deals with the disposition of property, and that doesn't even require any procedures. And what the city did was it followed its own internal procedures. And when they were about to do a cleanup operation, which as you noted, Judge Pryor, was absolutely needed in this area. I mean, the state declared it a health hazard. They had a procedure, a good procedure. They would give the homeless a seven-day written notice before they would clean up an area. Then the outreach teams would come back and individually tell them, hey, we're going to be cleaning this place up. So they had warnings all the time. Thirdly, when the products were taken, they were examined. If they were contaminated, and this was permitted under the agreement, if they were contaminated, they weren't, they were thrown away. If they could discern things in the property, they took them and they had a protocol. They would leave a notice there, that's the next thing, that they had seized the property and where you could pick it up. And then they would go back and tell them again, verbally, you know, we've taken the property at notice. So they had a complete procedure. They followed. It wasn't in writing, but it was done. And this court made factual findings on all these issues and ruled against the plaintiffs. So it's not a complicated, what the ACLU is trying to do is take this written agreement and make it into a de novo review. It's not. It's an abusive discretion review. This judge knows this thing inside and out, and he interpreted it properly. In addition, and besides this, making sure that he dealt with every issue that they raised. It is true, Mr. Scott. It is true, isn't it, that we still have to review de novo, whether the district court, despite its familiarity, longstanding familiarity with the decree, properly interpreted the decree. That is, whether its interpretation of the terms of the decree was correct or not. That's a question of law, right? That would be a question of law. Yes, sir. But my position is, is that A, he did interpret it correctly, and he made the factual determinations that were correct. And in addition, you know, Judge, I would point out, this thing's been on the books 30 years. They've had 35,000 encounters with the police that are documented with these people. Never once before the filing of this motion to terminate had there been a complaint ever lodged by the ACLU on any of these issues. And then in 2018, when they had this cleanup problem because of all the sanitation issues, they found some instances of property that largely the court distinguished. So you have a record that A, is factually supported, and B, the standard here under Horn is substantial compliance. Substantial compliance and in good faith. There was a plethora of evidence which he accepted that the city for over 20 years has done this in good faith. Yeah, so the real question is whether the city has changed the way that it deals with the homeless class, and as contemplated by the decree, has put durable processes in place to ensure their fair treatment according to the terms of the decree or not. Not perfection, not perfection, but good faith compliance and a durable remedy for dealing with isolated incidents that may be problems. That's absolutely true. In fact, there was testimony even from the plaintiff's own witness, Dr. Leifman, that the model, the city is the model for the United States on homeless issues because of the protocols and programs that it's adopted. That's in the record and he quoted from it. So we're the model. We have it, and it's in place. There was evidence. We're not going to go back, and if they're ever going to try to revisit this or another issue, they have their own pre-course, which is another 1983 action. The city has done everything, spent money, paid for things for 20 years. It's police are the epitome. For some reason, Mr. Scott, it appears that the clock just stopped sometime ago. I don't know exactly how much time is remaining. It stopped when there was a minute and a half, but I suggest that you wrap it up. Yes, ma'am. Pardon me? Judge, I can take a hint. I'll wrap it up. I'm just going to say- No, no, no. Please take a few couple minutes or a little time to wrap it up. I was also trying to signal to the courtroom deputy that we have a clock issue. No, no. Judge, I think I've said what I had to. You know, the judge in the opening and in the closing asked me a question. He said, if it's such a good deal, why should I terminate it? And I told him there's a lot of reasons. One, the city's done it for 20 years. They've done the model. They've made it. Other cities should adopt it. Two, the city wants to be in parity with the other 34 cities with the same rights. Three, this agreement was never contemplated to be in perpetuity, and it shouldn't be in perpetuity. Four, the times have changed. The city has changed. The culture has changed. It's not the role of federal courts to be continuously supervising local governments. Especially, as you point out, in institutional reform cases like this, and there's a lot of litigation. Right. Exactly. So for all those reasons- Mr. Scott, since you were at trial, I'm curious, and Mr. Waxman referred to this. He says there's still a wide gap between selfless and homeless. Is that true? Judge, I'm having a hard time hearing you. I'm sorry. Everyone's having a hard time. We've got to get this corrected before tomorrow. All right. Can you hear me now? Yes. Is that better? Yes, ma'am. All right. Does the record tell us, just for background facts, the difference between the gap between the number of homeless now and all the new shelters? That record's replete with all that. We went from 10,000 to 1,000. It's 90% less. There's 600 hardcore people. Hardcore people in the city of Miami. And in fact, there was testimony that this is actually hurting the workers from dealing with the hardcore because they think they can get away with things. And the court made factual findings in that regard, Judge. Well, my question is 1,000 shelters, but now they're 10,000. Is that what they're telling me? It went from 10,000 to 1,600 in the city of Miami in the last 20 years. Oh, that's the number of homeless? Yes. I see. Number of homeless. Okay. Yeah. Yes, ma'am. I'm sorry. Everybody's having trouble. Is that better now? Can you hear me? Yes. Judge, unless you have any other... Not a lot, Frank. Not a lot, Judge Howell. Y'all are so loud to me. Okay. We're going to have to work on this with our IT staff. So, Mr. Waxman, the time tells me you have three minutes. I think we let your opponents go over a little bit. So, I'll be observant of that fact. Okay. Thank you, Chief Judge. Judge Howell, I want to get right to Judge Howell's question. I'm looking at docket entry 382. This is the departmental order that talks about the warnings. In paragraph 9.6.23, it discusses, it says, if an officer determines that an individual is a homeless person, and through his observation, determines that a life-sustaining conduct misdemeanor is occurring in his presence, he must first check to see if there is an available shelter. So, we've got an officer coming upon Archer and Bass, and before he does anything, he's required to check if there is available shelter right then. And if we go down on, this is on page 35 of docket entry 382, it says, if the officer has probable cause to arrest the homeless person, and there is no available shelter, the officer shall not make an arrest, nor take any other police action, and then it says in parentheses, warnings, etc. So, as the district court did recognize correctly, if there is not available shelter, and the officer cannot offer that, then it prohibits having any contact whatsoever with that homeless person. Now, I'm not saying if the city is going in and is attempting to clean up an unsanitary area, that an officer or a city worker can't say to the homeless person, would you please step aside so we can clean this area? That's the way it should have been, but the testimony from witness after witness was that homeless people were told, leave and don't come back. And the judge said, well, there's a general bar against harassment, but that doesn't bar the police from saying, move on. And move on is code for leave and don't come back. And this is the testimony that was provided by witness after witness, people at a bus stop. Look at the video of Java Brooks. The video for her encounter at 578-39 shows that these police officers came upon her. They didn't suggest they were going to arrest her. They simply told her, move and don't come back. There was no offer of shelter, nothing of the sorts. And this happened time and time again. I want to go back to the property of Mr. Cawley. Mr. Waxman, what is the remedy that should be imposed if we find the city in contempt? Civil contempt, what's the remedy? The remedy should be some strict enforcement of this. No, no, there's two remedies for civil contempt. One is incarceration and one is a fine. And incarceration would be out of the picture here, obviously. So there's a fine. A fine for something that an officer or employee did in the past. Is that your remedy? No, I think there is. We don't rewrite the contempt decree. We don't issue a new one on a show cause order. So what's the remedy? What do we tell Judge Moreno to do? We tell Judge Moreno that the consent decree prohibited the course of conduct that was presented. We understand that. What do we tell him to do to the city? That the city has to have specific, they never presented any kind of. No, no, no. What is the penalty that is provided to the city? What do we tell him to do? This is a contempt proceeding. Or do we tell him what to do? Or do we send it back for him to determine what the remedy should be? Well, again, I think the first thing that needs to be done is the misinterpretation of the decree. You want us to say that the city is in contempt of the decree? Correct. Okay. If we do that, if we said that the city is in contempt, what would we do then? I think at that point, if the city is in contempt, it needs to go to the district court to determine what would be the proper remedy. In Pottinger, the judge. Wait a minute, wait a minute. We have to give the court some guidance. And it is not to rewrite the decree. It's to find the city. In my judgment, that's all there is. Or imprisonment. Now, those are the remedies we have instructed in this circuit for years. Those are the remedies. I don't issue a new decree. No. Or another injunction. Or another injunction. Do you agree with that? I do agree with that. And we're not asking the court to do that. Okay. That's why I asked the question. What remedy should he impose? I suppose a fine, which is what Judge Atkin did back in 1992. For each individual. Violation. Yeah. As I understand it, though, Mr. Waxman, your argument is that the city, I mean, that the district court was wrong to find that the city was not in contempt and was wrong for related reasons to terminate the decree. So what you would have us do is vacate that order and remand it to the district court to determine the appropriate remedy for a finding that's contempt and to reinstate the decree. That's exactly correct. And that is our prayer for relief, Your Honor. Okay. Thank you very much for the court's time. Thank you, Mr. Waxman. We have your case.